UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERT JACKSON a/k/a HATCHER, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>DR. NAVEEN RAJOLI, )<br>KATHY S. EDRINGTON, )<br>)<br>Defendants. ) | Case No. 1:14-cv-465-WTL-DKL |

**Entry Granting Motion for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff Robert Jackson a/k/a Hatcher ("Jackson") brings this complaint pursuant to 42 U.S.C. § 1983, alleging that defendants Dr. Naveen Rajoli and Nurse Kathy Edrington violated his constitutional rights through their deliberate indifference to his back, shoulder and knee pain. Specifically, Jackson alleges that Dr. Rajoli and Nurse Edrington were deliberately indifferent by refusing x-rays, examinations, physical therapy, and/or medications for his chronic pain. The defendants have moved for summary judgment and Jackson has not responded. For the following reasons, the defendants' motion for summary judgment [dkt 87] is **granted**.

**I. Standard of Review**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no

"genuine" dispute. *Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007).

As noted, Jackson has not opposed the motion for summary judgment. The consequence of his failure to do so is that he has conceded the defendants' version of the facts. *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921-22 (7th Cir. 1994). This does not alter the standard for assessing a Rule 56(a) motion, but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997).

## II. Undisputed Facts

A. *Background*

Jackson entered the Putnamville Correctional Facility ("Putnamville") on November 3, 2011. While at Putmanville, Jackson was enrolled in the Chronic Care Clinic for asthma, hypertension, osteoarthritis, Hepatitis C, and joint pain. As a Chronic Care patient, Jackson was seen every 12 weeks by a provider for his chronic conditions. Prior to Dr. Rajoli starting at Putnamville, Jackson reported to medical staff that he had an old, unrepaired rotator cuff injury to his left shoulder which caused limited and painful range of motion; that he had chronic low back pain for years; and that he had injured his mid-to-lower back while working at the prison.

B. *Dr. Rajoli's First Evaluation of Jackson*

On January 18, 2012, Dr. Rajoli evaluated Jackson for the first time. Jackson reported arthritis pain and limited mobility in his left shoulder. Dr. Rajoli examined Jackson and diagnosed chronic articular cartilage disorder involving his shoulder region. Dr. Rajoli ordered Jackson to continue his Mobic prescription for his chronic musculoskeletal pain, and noted that he would plan

2

for a steroid injection in Jackson's left shoulder. Dr. Rajoli also ordered one pair of arch support insoles for back and joint pain relief.

    B. *Jackson's Fall at the Marion County Jail*

On January 20, 2012, the Indiana Department of Corrections transferred Jackson to the Marion County Jail for court proceedings in Marion County. Jackson remained there until January 25, 2012. On January 25, 2012, while still at the Marion County Jail, Jackson reported that he tripped down the stairs. He reported pain to his right leg, arm, and backside. Medical staff at the Marion County Jail noted no visible injury and that Jackson's range of motion was within normal limits. Medical staff noted that Jackson had prior mobility issues and that his glasses were on his face and intact. Medical staff placed Jackson on sick call to see the jail doctor and they took his vital signs. Dr. Rohana at the Marion County Jail then evaluated Jackson.

    C. *Nurse Edrington's Treatment of Jackson after the Fall*

Jackson returned to Putnamville on January 25, 2012 and was examined by Nurse Edrington. Jackson reported that he had fallen on stairs at the Marion County Jail and had fallen 5-6 steps. Nurse Edrington reviewed medical records from the Marion County Jail, which showed that Jackson had been examined by the doctor there and that he had only fallen 1-2 steps according to the jail doctor's report. According to the jail doctor's report, Jackson was bruised and possibly sore, but he had no fractures or swelling. Jackson reported that he could not walk. However, Nurse Edrington asked Jackson to walk, and he had no difficulties or apparent pain in doing so. Nurse Edrington observed no problems with Jackson and advised him that he would likely be sore. Jackson requested an x-ray. However, Nurse Edrington is a licensed practical nurse ("LPN") and LPNs cannot order x-rays for patients; that has to be done by a doctor. Therefore, Nurse Edrington

placed Jackson on medical sick call list to see the doctor. Nurse Edrington did not think this referral was urgent because Jackson had just been seen by the jail doctor.

D. *Dr. Rajoli's Treatment of Jackson after the Fall and Jackson's Physical Therapy*

On January 26, 2012, Dr. Rajoli evaluated Jackson, who reported that he fell at the Marion County Jail and had knee and back pain afterwards. Dr. Rajoli noted that Jackson was using a back brace which was helping his back pain. Dr. Rajoli also noted that Jackson was on a temporary bottom bunk placement. Jackson reported constant left shoulder pain, which he rated a 6-7/10. Dr. Rajoli reviewed an x-ray of Jackson's left shoulder from 2011, which revealed degenerative joint disease of long duration. There is no medical treatment to fix degenerative joint disease of long duration. The medical treatment for this is to control pain and try to strengthen the joint. Dr. Rajoli examined Jackson and observed tenderness to palpitation in his right shoulder, and diagnosed him with a stiff back. Dr. Rajoli instructed Jackson to continue wearing his back brace and referred him to physical therapy to assist with his ambulation. Jackson already had an active prescription for Mobic for pain.

On February 8, 2012, Dana Miller, physical therapist, evaluated Jackson during his initial physical therapy session. Jackson reported a "big increase" in his lower back pain since his January 25, 2012, fall. Jackson stated that he had a 10-year history of lower back pain, which he claimed was exacerbated by his fall. Jackson indicated pain in his mid- to lower-back that extended along his beltline. Jackson also reported some pain in his left knee and left shoulder. However, Jackson requested that only his back pain be treated through physical therapy. Miller noted that Jackson had a back brace, which he was wearing and which was helping with his back pain. Miller also noted that Jackson had not had an x-ray of his back and had not tried heat therapy for his pain. Miller determined that Jackson had flare-up back pain. Miller educated Plaintiff on various lower

4

extremity and lower back stretching exercises, the latter of which Jackson indicated increased his comfort. Miller instructed Jackson to perform the home exercise/stretching program three to four times daily and to use heat compresses as needed for his back pain. Miller also suggested x-rays of Jackson's back, left shoulder and knee and instructed Jackson to follow up in one week. Jackson asked to be examined by a back specialist and Miller explained that his provider at Putnamville would have to refer him to a back specialist.

On February 9, 2012, Dr. Rajoli evaluated Jackson who complained of chronic back pain, which he reported was exacerbated by his fall. Jackson reported no tingling, numbness, or loss of function to his lower extremities, and Dr. Rajoli noted that Jackson was able to ambulate without difficulty. Dr. Rajoli also observed that Jackson was using his back brace, which was helping with his pain. Jackson claimed that he was informed by his physical therapist that he needed an evaluation by a back specialist. Specifically, Jackson claimed he needed "diagnostic tests" done to assess his back pain. Dr. Rajoli reviewed the notes from Jackson's initial physical therapy session, and based upon that review, deferred extensive diagnostic testing and advised Jackson to continue wearing his back brace. Dr. Rajoli examined Jackson and noted no back tenderness, no obvious deformities to his back and no para-spinal muscle spasms. Dr. Rajoli ordered x-rays of Jackson's lumbar spine, left shoulder and knee. Dr. Rajoli did not think extensive diagnostic testing was indicated or necessary at that time, as Jackson's pain was mild and similar to the pain he had prior to the fall at the jail. Dr. Rajoli believed that x-ray results would tell him if he needed to order further diagnostic testing.

The x-ray of Jackson's lumbar spine was taken on February 9, 2012 and revealed no specific abnormalities. The x-ray of Jackson's left shoulder revealed degenerative changes, particularly of the humeral head and glenoid, but no fractures, dislocations, or abnormalities of the

5

AC joint. The x-ray of Jackson's knee revealed mild degenerative joint disease. These x-ray results were largely normal for someone of Jackson's age and they did not indicate the need for any further medical testing or treatment.

On February 15, 2012, Jackson refused physical therapy and signed a refusal form. On the refusal form, Jackson indicated that he should see an outside back specialist for examination before continuing with physical therapy. On February 16, 2012, Jackson submitted a Request for Healthcare to cancel physical therapy if he could not see a chiropractor. Medical staff responded that Jackson should follow the provider's orders.

On February 23, 2012, Dr. Rajoli evaluated Jackson during a Chronic Care Clinic visit. Jackson reported continuing severe pain in his back. Dr. Rajoli examined Jackson and ordered one pair of arch support insoles for added back and joint pain relief and continued his current medications, which included Aspirin, K-Dur, Mobic, Lasix, Lisinopril, and Pravastatin.

Jackson saw Dr. Rajoli and Nurse Edrington a number of times over the next several months for a number of other health issues unrelated to his back and shoulder pain.

Degenerative changes of the back and joints are quite common in a 60-year-old, such as Jackson, and they are not treatable and are generally managed conservatively with exercise and mild pain medication. When a patient presents with pre-existing, long-standing chronic musculoskeletal pain with no new-onset or acute injuries, as Jackson did following his January 25, 2012 fall, the standard course of treatment is conservative care, including pain relievers, physical therapy, heat, rest, immobilization of the affected area (via splinting or brace), and exercises.

Jackson transferred from the Putnamville Correctional Facility to the Short Term Offender Placement Facility on July 10, 2012. Dr. Rajoli and Nurse Edrington had no further involvement with Plaintiff's care at that time.

### III. Discussion

Jackson alleges that Dr. Rajoli and Nurse Edrington violated his Eighth Amendment rights through their deliberate indifference to his serious medical need for treatment of his pain. The defendants argue that they were not deliberately indifferent to Jackson's pain because they provided him with proper treatment for his medical needs.

A. *Deliberate Indifference*

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant

doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

B. *Dr. Rajoli*

Dr. Rajoli argues that he was not deliberately indifferent to Jackson's serious medical needs because he provided him with adequate medical care.

Dr. Rajoli examined Jackson the day after his fall. At that time, Jackson already had a bottom bunk pass, a back brace, and medication for his pain. Dr. Rajoli ordered physical therapy and the physical therapist concluded that Jackson needed exercises, heat, and stretching to deal with his pain. The physical therapist also recommended x-rays, which Dr. Rajoli ordered. The x-rays were negative for any acute or new injury. Jackson then refused any further physical therapy because he wanted treatment from a back specialist or a chiropractor. That request was denied, but Dr. Rajoli prescribed additional pain medication and ordered arch supports to help Jackson with ambulation and his back pain.

In short, Dr. Rajoli examined Jackson carefully for his complaints of pain. He referred him to physical therapy and ordered x-rays. Though Jackson may have preferred to see a back specialist or a chiropractor, his disagreement with his treatment alone is insufficient to show that Dr. Rajoli was deliberately indifferent to his pain. *See Pyles*, 771 F.3d at 409. Dr. Rajoli has shown that he

exercised his medical judgment in treating Jackson and that he was not deliberately indifferent to Jackson's pain. *See Plummer*, 609 Fed. Appx. 861 (7th Cir. 2015); *Norfleet v. Webster*, 439 F.3d at 396. Jackson, having failed to respond to the motion for summary judgment, has provided no evidence or argument to the contrary. Accordingly, Dr. Rajoli is entitled to summary judgment on Jackson's claims against him.

### C. *Nurse Edrington*

Nurse Edrington argues that she was not deliberately indifferent to Jackson's serious medical needs because she appropriately assessed him on January 25, 2012, within her powers as an LPN. Nurse Edrington examined Jackson that day upon his return from the Marion County Jail. She reviewed the notes of the jail doctor who had ruled out any fracture or serious injury. Because, as an LPN, she could not order x-rays or prescribe medicine, she referred Jackson to the doctor and he was seen by the doctor the next day. In other words, Nurse Edrington examined Jackson within the confines of her powers as an LPN and referred him to a doctor for further evaluation and treatment. She has shown that these actions were not deliberately indifferent. Jackson has provided nothing to rebut this conclusion. Nurse Edrington is therefore entitled to summary judgment on Jackson's claims against her.

### IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment [dkt 87] is **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 1/26/16

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

Robert Jackson
P.O. Box 2800
Indianapolis, IN 46206

All electronically registered counsel